Minnie HEYMAN, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 79–2824–Civ–CA.

United States District Court, S. D. Florida.

Jan. 12, 1981.

Anna Barnett, Asst. U. S. Atty., Miami, Fla., for the government.

Irving Whitman, Miami, Fla., for plaintiff.

## MEMORANDUM OPINION

ATKINS, District Judge.

This action is brought pursuant to the Federal Torts Claims Act, 28 U.S.C. § 2671, et seq. and the National Swine Flu Immunization Program Act, 42 U.S.C. § 247b. Plaintiff, Minnie Heyman, seeks damages for pain and suffering, permanent disability and medical expenses allegedly resulting from Guillian-Barre Syndrome (GBS). Plaintiff contends that this condition was caused by a swine flu inoculation administered on October 19, 1976. The Government contends that plaintiff never suffered from GBS and, in the alternative, that if she did suffer from GBS, the condition was not caused by the swine flu inoculation. The Court having considered the evidence, stipulations and arguments presented by both parties concludes that plaintiff has failed to show that her condition was caused by the swine flu inoculation and, consequently, the Court finds that plaintiff is not entitled to recovery. The following constitutes the Court's findings of fact and conclusions of law.

## PLAINTIFF'S MEDICAL HISTORY

Plaintiff is eighty years old and suffers from a variety of medical problems that are not unusual for a woman of her age. In 1973, she was diagnosed as a diabetic. She was advised to go on a restricted diet and to take diabanese, a drug commonly used to control diabetes. Plaintiff maintains that she did not suffer any significant physical symptoms as a result of her diabetes prior to October, 1976.

Plaintiff was hospitalized in February 1971 after complaining of chest pains. Several tests were conducted and her physicians concluded that she was suffering from artherosclerotic cardiovascular heart disease. After an eighteen day hospital stay the chest pains dissipated and plaintiff was released. The heart problem did not restrict plaintiff's normal activities.

Plaintiff also suffers from a degenerative disc. This condition has caused plaintiff a substantial amount of pain in her back and legs. The condition appears to have worsened from 1970 to the present.

Plaintiff also suffers from arthritis and bursitis. These conditions have caused some pain in plaintiff's back and occasional loss of mobility in her shoulder. Plaintiff experienced a "pins and needles" sensation on occasion which also was attributed to the arthritic condition.

Plaintiff complained of a variety of other symptoms prior to October 1976. She had occasional facial spasms accompanied by sharp pain which her treating physician, Dr. Robert Jaffee, referred to as tic douloureux. On December 5, 1975 she complained of pain in her left hip and leg and her doctor noted a decrease in her left Achilles reflex. She also felt weak or fatigued on several occasions. Dr. Jaffee attributed this to her age, diabetes and heart condition. Considering her age and overall health, Dr. Jaffee found the occasional bouts of weakness unsurprising.

Plaintiff, along with her husband and neighbors, received a swine flu shot on October 19, 1976. Plaintiff testified that a few days later she began feeling weak and a week later she experienced severe pains in her legs and toes. Her husband and neighbors noticed that she looked weak and was not her usually active self.

Plaintiff did not consult a doctor until January 12, 1977. At that time she visited Dr. Jaffee and told him that she had been feeling weak for the past two months. She also complained of headaches and a recent syncopal (fainting) episode. She had suffered from a similar episode two months earlier but apparently the first episode was not sufficient to cause plaintiff alarm. Plaintiff was hospitalized for six days for observation. The syncope was attributed to arrythmia. The doctors also discovered a urinary tract infection and ampicillin was prescribed for this condition. Plaintiff's reflexes were tested but no abnormality was observed. Both plaintiff's experts testified that there was no sign of GBS in January.

About a month later, on February 14, 1977, plaintiff returned to Dr. Jaffee complaining of severe lower back pain radiating down her side and through both hips. The pain was so intense that plaintiff was unable to walk more than half a block. Plaintiff explained that she had been suffering from the pain for the past four or five months but that it had intensified over the past two weeks. A lumbar myelogram was performed and Dr. Jaffee concluded that the pain was the result of a herniated disc. When plaintiff failed to respond to physical therapy, however, Dr. Jaffee called in a specialist in neurology, Dr. Joel Dokson.

After several tests and consultation with Dr. Jaffee, Dr. Dokson concluded that plaintiff was suffering from a Guillian Barre-like syndrome. Dr. Dokson's conclusion was based on tests showing a marked elevation in cerebrospinal fluid and plaintiff's loss of deep tendon reflexes. Dr. Dokson also noted the weakness in plaintiff's legs and her inability to perceive vibration below the waist. Based on these symptoms, Dr. Dokson concluded that the pain was not due to the degenerative disc but to GBS. Plaintiff was given steroids and directed to continue with physical therapy.

By February 24, 1977, plaintiff began to feel stronger and the pain in her back was dissipating. By March 3, 1977, she no longer had any back pain and by March 7, 1977 she was able to walk with the assistance of a walker. Plaintiff was released from the hospital on March 7 but continued to receive physical therapy for the next several months.

Plaintiff's condition steadily improved during therapy. Dr. Dokson saw plaintiff on June 6, 1977 and although she still complained of pain in her back and right leg, the pain was considerably diminished. Dr. Dokson attributed the pain to tenderness of the sciatic nerve resulting from plaintiff's degenerative disc and the residue of GBS. Dr. Dokson concluded that GBS was still present because some of plaintiff's tendon reflexes were still absent.

Plaintiff next visited Dr. Dokson on August 6, 1977. She no longer suffered from any significant back pain although her ankle reflexes were still absent and she occasionally had "tingling" feelings in her extremities. Plaintiff was then able to walk without a cane.

Dr. Dokson last saw the plaintiff on July 13, 1978. Plaintiff still was encountering occasional discomfort in her feet (a "pins and needles" feeling) but her strength was substantially restored. She did complain that her legs got tired after walking any significant distance. Dr. Dokson concluded that plaintiff had made a good recovery and testified that she suffers no permanent disability as a result of the GBS.

Plaintiff still suffers from occasional blackout spells and pain in her back and legs. However, both of plaintiff's doctors testified that the syncopal episodes are not related to the GBS and that the pain is probably a result of the degenerative disc.

## THE DIAGNOSIS OF GUILLIAN-BARRE SYNDROME

Although both of plaintiff's treating physicians were convinced that plaintiff had GBS, the Government has challenged this diagnosis. The Government's theory is that plaintiff suffered from a peripheral neuropathy secondary to diabetes mellitus. Diabetes mellitus is a syndrome resulting from interaction between heredity and environment and is characterized by the presence of an excess of sugar in the blood and urine. About 15% of patients with diabetes mellitus have both symptoms and signs of neuropathy, and nearly 50% of all diabetic patients either complain of neuropathic symptoms or will exhibit slowing of nerve conduction velocity.

This neuropathy may occur at any time and does not appear related to the severity of the diabetic disease; it is commonly quite severe, even in mild untreated chronic diabetes. The pathology generally consists of degenerative changes in the peripheral nerves, nerve roots, and posterior column of the spinal cord. It is manifested by a predominance of sensory symptoms, paresthesias or severe pain in the lower extremities,

weakness of the legs, an elevated protein in the cerebral spinal fluid (CSF) (50 to 200 mg.%) absence of Achilles reflex, and in a majority of cases, an absence of knee jerks. See, Merritt, H., *A Textbook of Neurology* at p. 611–612; Adams R. and Victor, M., *Principles of Neurology* at 427–428; Gilroy, J. and Meyer J., *Medical Neurology* at 220–222.

GBS is manifested by symptoms quite similar to those of a diabetic neuropathy. A list of criteria for diagnosis of GBS has been compiled by the National Institute of Neurological Communicative Disorders and Stroke (NINCDS). The criteria are widely accepted by neurologists as an authoritative description of GBS. The NINCDS criteria lists as "Features Required for Diagnosis": progressive motor weakness of more than one limb and loss of tendon jerks. "Features Strongly Supportive of Diagnosis" include: rapid progression (50% of all GBS patients reach nadir by two weeks and 90% by four weeks); relative symmetry (i. e. if one limb is affected, the other usually is as well); facial weakness; mild sensory symptoms; an increase in cerebrospinal fluid; and recovery within two to three weeks after nadir.

Plaintiff's history of diabetes is not seriously disputed. She was diagnosed as diabetic as early as 1973 and her mother, brother and sister were also diabetics. On several occasions prior to her swine flu inoculation, plaintiff complained of symptoms which are consistent with a finding of a diabetic neuropathy. For example on February 16, 1971 she complained of occasional pain in her hip and reduced energy; May 27, 1971 she complained of pain in her left flank and lower abdomen; January 4, 1974 she complained of tingling "pins and needles", paresthesia in the knee and pain in right shoulder; January 30, 1975 she complained of shooting toothache—like pains in the left side of her face; April 29, 1975 she complained of being easily fatigued and of weakness; December 5, 1975 she complained of pain in her left hip and down the left leg, and the examining doctor noted a decrease in her left Achilles reflex; September 9, 1976 she complained of facial pain and frontal headaches.

The Government's expert Dr. Christian Keady testified that based on this history and plaintiff's hospital record, plaintiff's condition was most likely a result of her diabetes and not GBS. Dr. Keady pointed to the relatively long period of progression as inconsistent with a diagnosis of GBS; plaintiff had been suffering from a variety of neuropathic symptoms over the past several years. GBS is an acute neuropathy and according to Dr. Keady, if the condition was GBS it probably would have developed in two to four weeks. A diabetic neuropathy, on the other hand, generally develops over an extended period of time as plaintiff's condition apparently did. Dr. Keady also noted that plaintiff suffered severe pain. While mild sensory symptoms often accompany GBS, severe pain is rare. Pain is more commonly associated with a diabetic neuropathy. Dr. Keady conceded that plaintiff's symptoms were not entirely inconsistent with a diagnosis of GBS but insisted that the more likely diagnosis was that plaintiff experienced a peripheral neuropathy secondary to diabetes mellitus.

Plaintiff's expert and her treating physician, Dr. Dokson, rejected the theory that the condition was caused by plaintiff's diabetes. Dr. Dokson emphasized that a diabetic neuropathy does not develop in four weeks and, since there was no sign of a neuropathy on January 14, it was unlikely that diabetes was the cause of the neuropathy detected on February 24. In a diabetic neuropathy, the first symptom is a loss of deep tendon reflexes but plaintiff showed no indication that she had lost her reflexes on January 14. Moreover, Dr. Dokson noted that if plaintiff had a diabetic neuropathy she would have been unable to feel any pain from a pin prick and plaintiff did not manifest this symptom.

I conclude that plaintiff did suffer from GBS. In reaching this conclusion, I do not mean to disparage Dr. Keady's testimony. Both Dr. Keady and Dr. Dokson were stipulated to be highly qualified neurologists and both were extremely credible witnesses. I

choose to follow Dr. Dokson's conclusion primarily because he was plaintiff's treating physician and he demonstrated a more thorough familiarity with plaintiff's medical history than did Dr. Keady. Moreover, Dr. Keady conceded that a diagnosis of GBS was not inconsistent with the symptoms he was aware of, while Dr. Dokson was convinced that a diabetic neuropathy could be ruled out. Dr. Dokson's conclusion that plaintiff's condition was not caused by diabetes also is supported by evidence of the rapid progression of plaintiff's illness and other symptoms inconsistent with a diagnosis of a diabetic neuropathy.

## CAUSATION

The more difficult question is that of causation. The Government urges that even assuming the condition was GBS, plaintiff has failed to show that the condition was caused by the swine flu shot. The Government's position is that plaintiff developed GBS too long after the shot for the two incidents to be causally related. The Government suggests that the trigger for any GBS that plaintiff may have suffered was the urinary tract infection detected on January 14, 1980 and not the swine flu shot which was given some sixteen weeks prior to the onset of any symptoms of a neuropathy.

Before the swine flu program began in October, 1976, a nationwide surveillance system was established to evaluate illnesses that might be associated with the vaccine. By December 15, 1976, preliminary data from several states indicated the possibility of a relationship between the vaccine and GBS. GBS normally occurs in about one person per 100,000 per year but the incidence of GBS among vaccinees was approximately seven fold the normal rate. This relationship led to the suspension of the Program on December 16, 1976.

Dr. Lawrence Schonberger conducted an extensive analysis of the data collected during the nationwide surveillance. The study analyzed 1098 patients with onset of GBS between October 1, 1976 and January 31, 1977. The study concluded that there is a statistically significant relationship between the vaccine and GBS but that the relationship lasts no longer than ten weeks. Further, the period of increased risk due to the vaccine is concentrated in the first five weeks following inoculation. Plaintiff presented no evidence to challenge the results of the Schonberger study. Indeed, both of plaintiff's doctors testified that they agree with Dr. Schonberger's conclusion that GBS is likely to develop in less than ten weeks if at all.

Dr. Dokson testified, however, that the statistical conclusion reached by Dr. Schonberger does not conclusively demonstrate the lack of relationship between a swine flu shot and onset of GBS more than thirteen, fourteen or even sixteen weeks later. According to Dr. Dokson, whether a swine flu shot is the cause of GBS should be determined on an individual basis and not by reference to statistics. Thus, Dr. Dokson explained, it is "conceivable" that plaintiff's GBS was caused by the vaccine.

In response to Dr. Dokson's testimony, the Government introduced the deposition of a highly renowned epidemiologist, Dr. Stephen Schoenbaum. Dr. Schoenbaum testified that a clinician generally can not make a prediction as to whether a relationship exists between an illness and a preceding event such as a vaccination. A mere temporal relation between an event and an illness does not demonstrate any causal connection between the two events. To demonstrate such a connection, statistical studies must be conducted; otherwise the temporal relationship may be simply the result of chance.

Given the general inability of a physician to make accurate predictions of causation without at least some reference to epidemiological studies, plaintiff's position that her illness was caused by the swine flu shot amounts to nothing more than speculation. Plaintiff's own expert, Dr. Dokson, testified that it was merely "conceivable" that the shot caused the GBS.

The Government's theory is more plausible. GBS has been associated with urinary tract infections, see Leneman, The Guillian-

*Barre Syndrome,* 118 Arch.Intern.Med. 139, 141 (1966) and it is the Government's position that plaintiff's GBS, if any, was triggered by the infection discovered on January 14. Dr. Dokson admitted that there were no signs of GBS in January and that the illness probably developed in the six week interval between January 14 and February 23. If the vaccine caused the onset of GBS, surely there would have been some sign of the illness on January 14. The only symptoms reported by plaintiff prior to February 14 were syncopal episodes, shooting pains in her back and legs and a general weakness. Each of these symptoms, with the possible exception of the syncopal episodes, were also experienced prior to the vaccination and they are probably attributable to plaintiff's overall health, not the onset of GBS. All the expert witnesses testified that the syncopal episodes were not related to GBS. The pain plaintiff experienced prior to January 14 was probably a result of her degenerative disc.

In his deposition, Dr. Richard Restak suggests that the swine flu shot may act as a sensitizing agent which, when triggered by a subsequent event, causes GBS. Plaintiff did not argue this theory of causation and, in any event, the theory is at best speculative. No medical literature was presented to the Court which supports this theory and even Dr. Restak stated only that it was "possible" that the shot acted as a sensitizing agent. Given the speculative nature of this theory it must be rejected in favor of the more plausible theory presented by the Government. This is not to say that in future cases this theory will not prevail, only that in this case the credible evidence did not support this theory. In the future, more persuasive evidence may be presented and a different result may be reached.

### PROXIMATE CAUSE AND THE BURDEN OF PROOF

■ The Federal Torts Claim Act provides for application of the substantive law of the state where the cause of action arises. 28 U.S.C. §§ 1346(b), 2674. The law of Florida is applicable to this action. In Florida, it is the plaintiff's burden to plead and prove by a preponderance of the evidence that the defendant's act was the cause of injury. Mere possibility of causation is not sufficient, plaintiff must demonstrate that it is more likely than not that the defendant's act was a substantial factor in bringing about the injury. *See, e. g., Tampa Electric v. Jones,* 138 Fla. 746, 190 So. 26 (1939); *Greene v. Flewelling,* 366 So.2d 777 (Fla.App.1977). In this case plaintiff must show by a preponderance of the evidence that the swine flu inoculation was a substantial factor in bringing about the condition from which she suffered.

■ Plaintiff has not met her burden of proof. Although it is likely she suffered from GBS, she failed to show that there is any likelihood that the GBS was caused by the swine flu inoculation. GBS was not detected until sixteen weeks after the shot. The only credible evidence presented to the Court indicates that GBS develops over a period of five and at most ten weeks. The Court attributes the weakness and pain suffered by plaintiff within a week after the shot to her age and her pre-existing problems with her heart, her degenerative disc and diabetes. Moreover, the Government offered a more probable explanation for the onset of GBS, namely the urinary tract infection diagnosed four weeks prior to the diagnosis of GBS.

In concluding that plaintiff's condition was not caused by the swine flu inoculation, the Court does not mean to suggest that every case of GBS which occurs more than ten weeks after an inoculation is not causally related to the shot. *Compare Alvarez v. United States,* 495 F.Supp. 1188 (D.Colo. 1980) (finding no causation where GBS diagnosed seven months after inoculation) and *Schultz v. United States,* Civil No. 78–0259–K (S.D.Ca. Oct. 17, 1980) (finding no causation where GBS diagnosed eleven and one-half weeks after inoculation) *with Thompson v. United States,* Civil No. 79–1017–A (E.D.Va., Nov. 6, 1980) (finding causation where GBS diagnosed more than twelve weeks after inoculation). In this case, however, the only persuasive evidence

of causation indicates that ten weeks is the maximum interval in which a relationship between GBS and the swine flu vaccine exists, at least where there is an intervening illness which can act as the triggering agent. In subsequent cases a plaintiff may be able to present medical testimony supporting a contrary result. In this case, no such evidence was presented.

## CONCLUSION

Although plaintiff was a credible witness and I do not doubt that she suffered from the symptoms she described, I am constrained to find that she failed to prove that the swine flu inoculation was the cause of her illness. Accordingly, the Clerk of the Court is ordered to enter judgment in favor of defendant and the action is hereby dismissed. Each party is to bear its own costs.