Sonia COHEN, Plaintiff,

v.

The UNITED STATES of America, Defendant.

No. 78 CIV 5168 (LBS).

United States District Court, S.D. New York.

April 20, 1983.

Robert David Becker, New York City, for plaintiff.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., Leona Sharpe, Asst. U.S. Atty., William J.

Hibsher, Chief, Civ. Rights Unit, Asst. U.S. Atty., New York City, for defendant.

## OPINION

SAND, District Judge.

This action has been brought under the National Swine Flu Immunization Act of 1976, 42 U.S.C. § 247b(j)(1). The case had been transferred to the United States District Court for the District of Columbia and before that court, a final pretrial Order, in re Swine Flu Immunization Products Liability Litigation, M.D.L. Docket No. 330, Misc. No. 78–0040, ALL CASES (hereafter "M.D.L. P.T.O.") was entered. Thereafter, the case was remanded to this Court for purposes of local discovery and trial. The case has been tried to the Court pursuant to the aforesaid pretrial order and a pretrial order, solely governing this case, dated December 22, 1981 (hereafter "P.T.O."). By agreement, the trial was bifurcated, and only issues relating to liability were submitted to the Court. The following constitutes our findings of fact and conclusions of law, pursuant to F.R.C.P. 52(a).

*Introduction*

■ Plaintiff's contention is that she became ill with Guillain-Barre Syndrome (hereafter sometimes referred to as "G.B.S.") as a result of receiving a swine flu vaccination and sustained serious, permanent disabilities. Plaintiff's sole claim relates to G.B.S. and no other injuries or disabilities are claimed.[1] The defendant disputes that plaintiff contracted G.B.S. and claims that plaintiff is a "malingerer." For the reasons set forth below, we have concluded that plaintiff did not contract G.B.S. and is not suffering from any disabilities resulting therefrom. This conclusion is dispositive of the issues before this Court and we limit our findings of fact and conclusions of law to this single issue.[2]

*Findings of Fact*

It is undisputed that on October 15, 1976, plaintiff received a swine flu inoculation at Co-Op City, Bronx, New York, under defendant's swine flu program and that the swine flu vaccine was researched, tested, developed, manufactured, marketed, promoted, distributed and administered by the United States and by program participants. P.T.O. ¶ 2. A mass immunization program in influenza involving so many people had never before been undertaken by the United States Government. *Id.* "[O]ver forty-five million Americans—or one third of the adult population—were vaccinated." *Bean v. United States,* D.Colo., Civ.Action 79–F–571, Memo Opinion (August 19, 1980) p. 3 (discussing the history of the immunization program and the ensuing legislation and litigation.)

*Plaintiff's History and Medical Evidence supporting a claim of Guillain-Barre Syndrome*

Plaintiff's case was predicated on:

A) her testimony as to the symptoms and disorders she sustained and the medical advices she had received;

B) the expert testimony of Dr. Blatt;

C) the proceedings before the Social Security Administration which plaintiff contends constitutes a determination which collaterally estops defendant from contesting plaintiff's claim that she contracted G.B.S. (See p. 595, *infra*).

---

1. The M.D.L. P.T.O. provides:

   "Where the United States contests that the illness alleged is in fact Guillain-Barre Syndrome, and the trial court finally determines after a trial of the issue, that the illness is Guillain-Barre Syndrome, then the United States will stipulate that no theory of liability (*i.e.,* negligence or any theory founded on the law of the applicable jurisdiction) need be proven, and the only remaining issue on liability would be causation; ...."

2. The plaintiff has been found to be disabled by the Social Security Administration and has been awarded benefits at the rate of $300. per month since February, 1980. The finding of disability was predicated on the Administrative Law Judge's conclusion that "the claimant has been severely impaired since December 2, 1976 due to 'Guillain-Barre Syndrome.'" Memo of ALJ, February 4, 1980. We decide only that plaintiff does not suffer from impairments resulting from G.B.S. We do not determine whether plaintiff is disabled as a result of any other disease or mental disorder.

A. Plaintiff's testimony, briefly summarized, is that she was born in Poland[3] on August 21, 1942 and after divorcing her first husband, married Ralph Fol on September 10, 1976. She was a graduate of Thomas Edison College, having obtained a degree in chemistry that year. Her employment history includes work in 1973 as a medical technologist and in other related capacities. She also worked as a companion-caretaker for elderly and disabled persons. In October, 1976, a few weeks after her marriage, she took a position taking care of a blind woman who lived in Co-Op City which employment occasioned her moving out of the apartment she shared with her husband and father-in-law and into this woman's apartment in Co-Op City. On October 15, 1981, while en route to do some shopping, she passed a place at which swine flu shots were being administered. After a brief conversation with a person she describes as a "clerk", she received an inoculation. She had some further discussion with the "clerk" concerning plaintiff's volunteering to assist in the program.

Plaintiff testified that at this time, she began to feel ill and a doctor was called who told her to rest. She said that she was unable to stay because of the demands of her job and proceeded to a supermarket. While shopping, she experienced chest pains and felt feverish and returned to the Co-Op City apartment to rest.

According to plaintiff, some time within one to three weeks after receiving the inoculation, she saw a Dr. Migden at his office on East 14th Street in Manhattan. She complained of feeling feverish and of a funny feeling in her hands and legs. Plaintiff testified that Dr. Migden extracted some spinal fluid and told plaintiff that she had G.B.S. She testified that Dr. Migden had advised hospitalization which she refused because of the expense and that she saw him three or four times. Dr. Migden died in 1977.[4]

The credibility of plaintiff's description of her treatment by Dr. Migden and his diagnosis was the subject of challenge by defendant's medical experts. First, they note that she had said that she couldn't remember the physician's name. See, history given to Dr. Peter Tsairis, as set forth in his report dated September 21, 1981, Defendant's Exhibit 6.[5] Yet this same doctor was described by plaintiff as being an old friend who was assisting plaintiff in her application to medical school. Second, plaintiff has at times stated that no spinal tap was done.[6] Dr. Tsairis expressed doubt that such a procedure would be conducted in an office unless it was proximate to a hospital or adequate medical facilities. Finally, the plaintiff's subsequent symptoms are said by defendant's experts to be inconsistent with a diagnosis of G.B.S., but a physician diagnosing a patient as suffering from G.B.S. would have been more emphatic and insistent on the need for hospitalization than appears to have occurred here.

The Court finds that Dr. Migden either did not in fact make a definitive diagnosis that plaintiff was suffering from G.B.S. or, if he did so, that diagnosis was incorrect and based on inadequate data as subsequent events made clear.

Although plaintiff claims that she experienced significant pain and disability following her visits to Dr. Migden, it appears that

3. Plaintiff attributed certain discrepancies in her account of her symptoms and medical history to language difficulties.

4. Efforts to locate his successor or the custodian of his medical records, undertaken at the suggestion of the Court, have proved unavailing.

5. Because of the technical nature of the testimony and the apparent intent of the parties not to obtain a transcript of the trial, the Court received into evidence the reports furnished to the defendant by defendant's medical experts as well as hearing their oral testimony. Defendant's objection that these reports were hearsay was overruled: the author of the reports was on the witness stand and subject to cross-examination when the reports were introduced.

6. One of the characteristics of G.B.S. is increased protein in the spinal fluid after the patient has had the illness for a week or more. Deposition of Dr. Barry Arnason, Defendant's Ex. 7, p. 28.

there is a hiatus in her seeking medical aid based on her claim of G.B.S. following a swine flu shot. Plaintiff contends that she saw several doctors, including one who had kept her waiting for 4½ hours, who refused to treat her after being told of the swine flu shot because of a reluctance on their part to "get involved" with the government. Plaintiff is vague as to the names, dates and locations of these occurrences.

Plaintiff testified that within thirty days of receiving the shot on October 15, 1976, she experienced fever and chest pains, which subsided; that within three or four weeks, she started experiencing weakness in her lower extremities and hands; that after exercise, there was some improvement; that she was compelled to leave her job on October 29, 1976 when she was suffering from a condition she described as "paralysis"; that she returned to work for five weeks in 1977 and was compelled to quit because she had relapsed and couldn't stand or use her hands; that she again tried to return to work in 1978 but couldn't endure the traveling or perform her duties.

Plaintiff became a member of her husband's HIP plan and in November, 1976, she consulted with Dr. Blatt through HIP. She was also examined by Dr. Morton Marx, a neurologist. An electrodiagnostic study was also conducted by Dr. Joseph Goodgold.

In 1977, plaintiff went twice to the Institute for Crippled and Disabled for out-patient care, which she discontinued, allegedly because of the expense. Similarly, on June 18, 1978, she went to Columbus Cabrini Hospital but discontinued treatment there because she was then working.

In 1978, plaintiff became pregnant and her child was born at University Hospital. It is plaintiff's testimony that she was bedridden during her pregnancy, needed braces and supports on her hands and legs and that she had sought no other medical treatment because she was told that nothing would help her condition, except exercise which she was able to perform at home. At University Hospital she recounted the swine flu shot and, before her baby was born, expressed concern about her ability to lift the baby. In fact, she states that she was unable to lift the baby because of the weakness in her arms and that Home Health Service assisted her with the baby for two or three months after the birth of the child. She claims that she continues to utilize homemaker services to care for the child and to perform household chores which she cannot perform due to her disabilities.

The medical records of HIP disclose that on November 15, 1976, plaintiff complained to a Dr. Shak of pain in the knee which she had been experiencing for six months. Plaintiff denies furnishing this history and attributes the record to language difficulties she experienced with Dr. Shak. The records also indicate a complaint to a Dr. Soren of instability in her left knee. Plaintiff asserts that she complained of both legs.[7] She asserts that she did not tell Doctors Shak or Soren about the swine flu shot because of her fear of being rejected for treatment by doctors unwilling to become involved. The HIP records disclose that in June, 1977, plaintiff told a neurologist that she was experiencing weakness in both legs since receiving a swine flu shot.

Plaintiff claims that she suffers severe disabilities which require her to use a wheelchair, prevent her lifting objects as light as seven pounds, restrict her movements, subject her to continued pain and require her to wear supports. These supports and plaintiff's reliance on them have been summarized by Dr. Kristjan T. Ragnarsson, a defendant's medical expert, as follows:

"She was wearing the following elastic 'supports': for the upper extremities, elastic wrist bands with Velcro strapping and forearm sleeves reaching to just above the elbow. On the lower extremities, she was wearing elastic stockings reaching from the toes up to the groin. Over this she had wrapped an elastic

---

**7.** A characteristic of G.B.S. is the symmetry of the symptoms. *See* Defendant's Ex. 4, fn. 5, *infra.*

bandage around the upper thigh and an elastic knee cuff with lateral metal uprights with knee joint hinges. Around the ankles, she was wearing elastic cuffs with a hole cut out for the heel. Over these she was wearing tight boots that reached up to the mid calf. While wearing these 'supports' she was capable of moving all joints in a slow manner but without the 'supports' she could not move at all."

B. *Testimony of Dr. Robert Blatt*

Plaintiff's sole live medical witness was Dr. Blatt, a specialist in internal medicine who testified voluntarily on behalf of his patient. He testified that he has seen plaintiff every one-two months since 1977. Plaintiff furnished him with a history which included receipt of a swine flu shot in 1976, weakness and pains in arms and legs, symptoms persisting. He testified that in June, 1977, "it has been thought she had G.B.S." a conclusion which he based on her history and prior medical records, including the results of a neurological consultation. It was his opinion, to a reasonable degree of medical certainty, that plaintiff had G.B.S. and that there was a causal connection between the flu shot and this illness.

On October 21, 1977, Dr. Blatt had diagnosed plaintiff as suffering from arthritis and prescribed bufferin. On November 14, 1977, his medical records indicate he again saw plaintiff who had already been seen by a neurologist, at which time her legs were a little stronger. His ultimate conclusion based on her history and his observation of the weakness in plaintiff's arms and legs was that she was suffering from the residuals of G.B.S.

Plaintiff relies on the proceedings before the Social Security Administration to support her claim. We deal with the claim that the Administrative Law Judge's determination collaterally estop the defendant *infra* at p. 595. Plaintiff also urges that, apart from its estoppel significance, the proceedings before the A.L.J. are relevant and persuasive as to the factual issue of whether plaintiff suffers from the vestiges of G.B.S.

The A.L.J. cited in support of his finding the report of Dr. Blatt, her treating physician, consistent with his testimony at this trial, and a report from "a consulting physician, Harold S. Goldberg, a diplomate of the American Osteopathic Board of Physical Medicine and Rehabilitation" which stated that plaintiff "was in good health until October, 1976 when she received a Swine Flu Vaccination and thereafter developed a 'Guillain-Barre Syndrome.'"

The defendant argues that neither the report of Dr. Blatt or of Dr. Goldberg are based upon clinical data and further notes that the examination of plaintiff by the medical experts upon whom the Government relies took place subsequent to the A.L.J.'s determination.

*The Government's Experts*

As has already been noted, the Government called as medical experts two neurologists, Dr. Peter Tsairis and Dr. Saran Jonas, an expert in rehabilitative medicine, Dr. Kristjan Ragnarsson, and a psychiatrist, Dr. Pamela S. Ingber. The Government also called as a fact witness, the neurologist who had seen plaintiff at HIP, Dr. Morton Marx, and plaintiff with leave of the Court, expanded his testimonial role to include expert testimony. All of these doctors concluded that plaintiff did not suffer from G.B.S. and is not now suffering from any residuals of that illness.

Dr. Tsairis, a Board certified neurologist, examined the plaintiff on April 13, 1981, having prepared himself for that examination by reading plaintiff's medical records. Dr. Tsairis read plaintiff's deposition (Plaintiff's Ex. 17) after his examination but before writing his report (Defendant's Ex. 6).

Dr. Tsairis was of the opinion that plaintiff's complaints of chest pain and complaints concerning her left knee suggested synositis, *i.e.,* arthritis in the joint.

As noted, Dr. Goodgold had conducted electrodiagnostic studies which showed mild abnormalities in three muscles, suggestive of hyperirritability in the L–5, S–1 motor

outflow. Dr. Tsairis was of the opinion that this report is not consistent with a diagnosis of peripheral neuropathy (a classification which includes G.B.S.).

Dr. Tsairis conducted an examination of plaintiff and noted especially that her stretch reflexes were symmetrically brisk and there were no pathological responses. He concluded that plaintiff did not have a peripheral neuropathy or any neurological disorder. He recommended that plaintiff be examined by another neurologist for a second opinion and by a psychiatrist to evaluate his opinion that plaintiff was probably malingering.

Dr. Tsairis' nurse, Mary Phalen, also testified as to her observations of plaintiff's ability, when not in the doctor's presence, to perform functions such as moving her arms to remove her blouse and push her foot into a boot.

Dr. Saran Jonas examined plaintiff on October 22, 1981. He is a Board certified neurologist and is also certified in internal medicine. Prior to writing his report (Defendant's Ex. 10), he read certain of plaintiff's prior medical records.

He testified that he has never seen a case of G.B.S. where hospitalization was not required, because it is a rapidly disabling disorder, which generally reaches its apex in 1–3 weeks. He testified to a number of symptoms of which plaintiff complained which are inconsistent with G.B.S. For example, he testified that although a certain percentage of patients complain of pain in the early stages of G.B.S., pain is not a "major issue" in G.B.S. and should not be present after the acute period.

Severe permanent disabilities from G.B.S. are rare, but occur. He testified when this occurs so that the patient is markedly paralyzed there is no tendon reflex. But both Dr. Jonas and Dr. Tsairis noted that plaintiff has normal or brisk reflexes. In Dr. Jonas' opinion, the presence of reflexes, to the extent found in plaintiff, rules out a multiple root nerve disorder such as G.B.S. He also noted the absence of any findings of abnormal reflexes in plaintiff's prior history and reports of normal reflexes (e.g.,

Dr. Lowenthal on June 13, 1977). He opined that if at any time plaintiff suffered a diminution in her reflexes, any disability in her muscles would have been cured prior to the restoration of a reflex since reflexes are the more sensitive indication of illness.

Dr. Kristjan T. Ragnarsson testified that he is Board certified in Rehabilitative Medicine and is affiliated with the Institute of Rehabilitative Medicine (sometimes referred to as the "Rusk Institute"). He testified that he has treated some 40–50 G.B.S. patients. He examined plaintiff on October 16, 1981, having previously read her medical reports and deposition. He, too, found plaintiff to have strong reflexes.

We have already quoted (pp. 592–593 *supra*) his observations of plaintiff's braces and supports. When wearing these braces, plaintiff could ambulate with a cane. Without these supports, plaintiff claimed she could not move at all. But Dr. Ragnarsson testified he has never observed a patient who could perform these activities with supports who could not perform them without such supports. The elastic supports worn by plaintiff would be suitable for varicose veins or ligament problems but would not be prescribed or be appropriate for paralysis.

He observed no evidence of muscle atrophy. It was his opinion that there were no signs or laboratory data suggesting a severe peripheral neuropathy such as G.B.S.

Dr. Morton Marx, subpoenaed by the Government as a fact witness, testified that he first saw plaintiff on November 15, 1976. He saw her again on June 22, 1977 at which time she evidenced no neurological abnormalities. Her history included the receipt of a swine flu shot and he believed it important to rule out neuropathy, hence the reference to Dr. Goodgold, whose electrodiagnostic report he read and initialled on July 27, 1977. In his opinion, Dr. Goodgold's report excluded a diffuse neuropathy as a possible diagnosis. He thought that plaintiff had a nerve root derangement and his diagnosis is probable rheumatoid arthritis.

He testified that he never diagnosed plaintiff's condition as being G.B.S. and does not believe that a diagnosis of G.B.S. could be made based on the records here.

Dr. Marx testified that he never discussed plaintiff's condition with Dr. Blatt and that he disagrees with Dr. Blatt's diagnosis of G.B.S. He notes that suggestions that plaintiff's condition is G.B.S. (*e.g.*, by Dr. Lowenthal) are not based on neurological findings such as a testing of reflexes or a spinal tap.

Dr. Pamela S. Ingber, a psychiatrist, testified, based upon a 2½ hour meeting with plaintiff, that in her opinion, plaintiff is a malingerer. A "malingerer", as that term is used in psychiatry, describes a form of illness in which the patient (usually someone with prior exposure to the medical profession, such as a para-professional) evidences physical symptoms in conscious pursuit of some secondary gain.

Dr. Ingber's testimony consisted of a tracing of plaintiff's history, lifestyle, motivations and other aspects of her personality and attitudes. As noted *supra,* at fn. 1, however, we do not find it necessary to determine whether plaintiff is a "malingerer" or the extent, if any, to which plaintiff's symptoms may be real but psychological or may be consciously feigned. It suffices for the disposition of this proceeding that the Court has reached the conclusion that plaintiff did not contract G.B.S. which constitutes her sole claim of injury.

## CONCLUSIONS OF LAW

Guillain-Barre Syndrome is a disease of the peripheral (as distinguished from the central) nervous system. Its cause is unknown and the diagnosis is descriptive. The weakness and loss of motion associated with G.B.S. results from a disintegration of the mylon coating of nerve root endings. The diagnostic criteria for G.B.S. have been established by an Ad Hoc committee of the National Institute of Neurological and Communicative Diseases and Stroke (Defendant's Exh. 4) and are generally accepted in the medical profession.

The Court finds that the medical evidence adduced by the defendant overwhelmingly establishes that whatever condition, if any, that plaintiff may have, it is not G.B.S. We find particularly persuasive the testimony of Drs. Tsairis, Jonas and Ragnarsson with respect to plaintiff's reflexes. The testimony of Dr. Ragnarsson as to plaintiff's ability to perform with totally ineffective elastic supports, motions which she professed to be unable to perform absent such supports also persuasively negates any neurological impairment.

We will not prolong this opinion by a detailed analysis of each and every finding and alleged symptom which is inconsistent with G.B.S. These are set forth in the report of defendant's medical experts and the Court finds them persuasive, as it does the testimony of Dr. Marx that G.B.S. was ruled out by him as a possible cause of plaintiff's complaints.

*Collateral Estoppel*

During the trial plaintiff orally moved for summary judgment in her favor on the grounds that the administrative determination on her claim for disability benefits by the Social Security Administration estops the United States from denying that she suffers disabilities from G.B.S.

We deny plaintiff's motion because Social Security disability hearings are not adversary proceedings in which the United States appears as a party to oppose an applicant's claim. *Richardson v. Perales,* 402 U.S. 389, 410, 91 S.Ct. 1420, 1431, 28 L.Ed.2d 842 (1971); *Cutler v. Weinberger,* 516 F.2d 1282, 1287 (2d Cir.1975). The ALJ is not a counsel representing the Government but is an "examiner charged with developing the facts", *Richardson v. Perales, supra,* 402 U.S. at 410, 91 S.Ct. at 1431.

The expert medical testimony here compels a conclusion as to the cause of such disabilities as plaintiff may, in fact, have sustained which differs from that of the ALJ.

As we have more than once noted herein, we determine solely that plaintiff has not contracted G.B.S. and refrain from any

finding as to whether she is otherwise disabled.

We conclude that the plaintiff has failed to establish that the injuries she claims to have sustained were caused by the immunization.

The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff and the action is dismissed.

SO ORDERED.