Phyllis M. PETERSON, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 78–4098.

United States District Court, D. Idaho.

Aug. 18, 1983.

---

Lloyd A. Herman, McKanna & Herman, P.S., Spokane, Wash., for plaintiff.

Laura D. Millman, Trial Atty., Torts Branch, Civil Division, U.S. Dept. of Justice, Washington, D.C., Guy G. Hurlbutt, U.S. Atty., District of Idaho, Boise, Idaho, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CALLISTER, Chief Judge.

The plaintiff, Phyllis Peterson, brought this action to recover damages for injuries she allegedly suffered as a result of receiving a vaccination for swine flue. Mrs. Peterson brought this suit under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) and 2671 *et seq.*, pursuant to the National Influenza Immunization Program of 1976 (Swine Flu Act), 42 U.S.C. § 247b(j)(1), Pub.L. 94–380 (August 12, 1976). The Swine Flu Act provides that actions for injuries resulting from the swine flu vaccination shall be deemed FTCA actions. *See* 42 U.S.C. § 247b(k)(5)(A).

After Mrs. Peterson filed this action, it was transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for pretrial proceedings pursuant to 28 U.S.C. § 1407. Thereafter, it was remanded to this Court for further proceedings. Trial was held to this Court, without a jury, from July 25, 1983, through July 29, 1983.

From that trial, two crucial issues emerged: (1) What malady, if any, is Mrs. Peterson suffering from? and (2) If Mrs. Peterson is suffering from some malady, was it caused by the swine flu vaccination? Mrs. Peterson claims to be suffering from Guillain-Barre Syndrome, Brachial Plexus Neuropathy, and pain, all of which were caused, she argues, by the swine flu vaccination.

If Mrs. Peterson is suffering from Guillain-Barre Syndrome, the Government will admit liability. If she is suffering from some other affliction, the Government will not admit liability.

Guillain-Barre Syndrome (GBS) and Brachial Plexus Neuropathy (BPN) are both disorders of the peripheral nervous system. Peripheral nerves are those nerves which leave the spinal column and extend throughout the body. The peripheral nervous system does not include the brain, brain stem, and spinal column which comprise the central nervous system.

The precise cause of GBS is as yet unknown. At this time neurologists believe that some mechanism causes the body's own antibodies to attack and destroy the fatty insulation surrounding peripheral nerves. This insulation is known as "myelin." Gaps in the myelin interrupt the transmission of nerve impulses in much the same way that worn insulation can cause short-circuiting in an electrical wire. The result is weakening or paralysis of the muscles served by

those nerves. The weakness or paralysis lasts until the myelin can "grow back."

There is a dispute in this case over the precise symptoms of GBS. The Court will examine that dispute later in this opinion. At this point it will be enough to say that GBS is generally characterized by muscle weakness or paralysis, and loss of tendon reflexes, which progresses for about four weeks and then recedes, usually allowing the victim to recover completely.

The brachial plexus is a network of nerves which are part of the peripheral nervous system. This network originates in the spine, passes through the shoulder and runs down into the arm. BPN is a general term indicating a disorder with the brachial plexus nerves.

Mrs. Peterson received her swine flu vaccination on October 23, 1976, in Preston, Idaho. At that time she was 47 years old. She testified at trial that fifteen minutes after receiving the vaccination, she felt nauseous. Although she rested for the remainder of the day, she did develop a headache and soreness in her left arm and shoulder. These symptoms lasted until October 25, 1976, when she went to see Dr. Raymond Malouf, her treating physician. Dr. Malouf is a general practitioner who does some surgery. He felt that Mrs. Peterson had a muscle spasm and prescribed an antispasmodic medication for her.

After that visit, Mrs. Peterson felt fine until November 5, 1976. On that day she suffered a deep, intense pain in her left jaw, neck, left chest area, and left arm. She testified that the pain was a stabbing "electric" pain, much more excruciating than the mere soreness that she suffered on the day she received the vaccine.[1]

This pain persisted and on November 7, 1976, Mrs. Peterson again visited Dr. Malouf. After examining her, Dr. Malouf ruled out the possibility that cardiac problems were causing the pain. At that time,

he did not know the cause of her problem. He prescribed some pain medication for her.

Although Dr. Malouf admitted that he is not a neurologist and could not give a positive answer, he now feels that Mrs. Peterson might have had BPN which was caused by the swine flu vaccination. He also testified that there was a possibility that she had GBS which was caused by the vaccination. Dr. Malouf did not discuss in detail why he felt Mrs. Peterson might have BPN or GBS.

The diagnosis made by Dr. Malouf, and the diagnoses made by the other physicians, which the Court will discuss, were for the most part made in light of Mrs. Peterson's past medical problems. This history includes a spinal fusion in 1970; persistent leg pain occurring after the fusion; and an obesity problem that existed both before and after the 1976 vaccination.

After seeing Dr. Malouf, Mrs. Peterson next went to see Dr. James Steel, an orthopedist, on December 13, 1976. She complained to him of left chest and arm pain. Dr. Steel's examination revealed a calcium deposit in her shoulder which "could have been related" to her pain. *See* deposition of Dr. Steel at p. 18, lines 1–4. Dr. Steel did not feel that Mrs. Peterson was suffering from BPN although he is not a neurologist and had only limited experience with neuritis cases. He further stated that Mrs. Peterson had no weakness or tendon reflex abnormalities.

Dr. Steel referred Mrs. Peterson to Dr. John Sorensen, a cardiologist. Dr. Sorensen saw Mrs. Peterson on December 13, 1976, December 19, 1976, and on January 6, 1977. During these visits he gave her a physical examination and found no evidence of muscle weakness or abnormality in her nervous system. Dr. Sorensen testified that he was unable to diagnose the cause of Mrs. Peterson's pain, although he did not believe that she had BPN or GBS. His conclusion was

---

1. The Court realizes that there is conflicting testimony over whether Mrs. Peterson's intense pain actually began on October 25, 1976. It is widely agreed that intense pain arising so soon after the vaccination would be strong evidence

that Mrs. Peterson is not suffering from Guillain-Barre Syndrome as she claims. The Court is inclined, however, to believe Mrs. Peterson's testimony during trial that her intense pain did not begin until November 5, 1976.

based on his belief that his physical examination of Mrs. Peterson showed none of the classic signs of BPN or GBS.

Dr. Sorensen referred Mrs. Peterson to Dr. John Bender whose speciality is physical rehabilitation. Dr. Bender first saw her on December 30, 1976. She complained to him of pain in her left shoulder and arm and numbness in two fingers on her left hand. Dr. Bender then did an electromyographic examination of her left upper extremity.

Electromyography is a test done to measure the response of a certain muscle to stimulation of a certain nerve fiber connected to that muscle. Although this is a simplification, the test basically measures the time it takes for the muscle to respond after the nerve fiber has been stimulated. If the muscle responds slower than normal, the examiner could conclude that there is some defect in the nervous system's transmission of the stimulus to the muscle. An abnormal slowing of nerve conduction velocity is often the result of a neuropathy, and depending on the degree of slowing could indicate the presence of GBS or BPN.

On the basis of his examination, Dr. Bender concluded that there was some abnormal slowing in the left ulnar nerve transmission in the proximal position, i.e., the part of the ulnar nerve that begins in the neck, runs across the armpit and down the left arm. The distal section of the ulnar nerve—that part of the ulnar nerve in the lower arm and hand—was normal according to Dr. Bender's study.

Mrs. Peterson's ulnar nerve abnormality and pain led Dr. Bender to conclude that she was suffering from BPN. The cause of the BPN, he testified, was the swine flu vaccination. He felt that the vaccination was the only cause suggested by her test results and pain history. His conclusion was also based on his belief that BPN rarely occurs spontaneously and is caused normally by some precipitating factor such as trauma or vaccination.

Dr. Bender also testified that BPN is a different affliction than GBS, and that Mrs. Peterson is not suffering from GBS. He described GBS as being an acute illness characterized by muscle weakness or paralysis followed by recovery. Dr. Bender's examination of Mrs. Peterson indicated no muscle weakness or paralysis, and no loss of tendon reflexes. He indicated in a vague way that she may have atypical GBS if one were to include "all variations of neuropathies" in the term "Guillain-Barre Syndrome." *See* deposition of Dr. Bender at p. 16, line 22.

On March 9, 1977, Mrs. Peterson engaged in a controlled test where her ability to do homemaking tasks for forty minutes was examined. She did things such as sweeping and mopping, bending and stooping, and putting objects from low shelves to high shelves. The test results showed that she had no problems accomplishing these tasks.

Mrs. Peterson was next examined by Dr. Glenn Terry on November 8, 1979. Dr. Terry is an orthopedic surgeon practicing mainly in the field of sports medicine. Dr. Terry testified that his examination of Mrs. Peterson indicated that some neuropathy may be causing her pain. He found that she had a thickening of the ulnar nerve which, as previously explained, is a nerve in the brachial plexus region. He referred Mrs. Peterson to Dr. Jack Petajan for testing of her neurological system.

Dr. Petajan is a neurologist and teacher of neurology at the University of Utah Medical Center. He first saw Mrs. Peterson on December 6, 1979. She told him that she had suffered from pain in the left chest region; general weakness for the last seven or eight months; paresthesia in the feet, hands and shoulders; and numbness in her feet.

Dr. Petajan's physical examination of her showed that her deep tendon reflexes were normal. An electromyographic study showed a slowing of speed of conduction in the nerves of her left leg. Two nerves in her left leg, the peroneal and tibial nerves, "were slowed." *See* deposition of Dr. Petajan at p. 8, lines 5–6. In addition, the sural nerve showed a minimal slowing. However, the median and ulnar nerves of her upper extremities were normal, and the left

ulnar motor conduction was normal. He also found that her cerebrospinal fluid protein was slightly elevated and that there was a reduction in the number of motor neurons in her feet muscles.

Dr. Petajan initially felt that Mrs. Peterson was suffering from axonal neuropathy. Axonal neuropathy is a disturbance in the nerve fiber itself as opposed to a disturbance in the myelin sheath surrounding the nerve. But in October of 1982, Dr. Petajan did further nerve conduction studies on Mrs. Peterson which showed an improvement in the conduction velocities of her peroneal and tibial nerves. This improvement led him to lean more to a diagnosis that Mrs. Peterson has a demyelinating neuropathy. He was unwilling, however, to conclude firmly that Mrs. Peterson's neuropathy was of the demyelinating rather than axonal type. The only way that Dr. Petajan would feel comfortable with making a firm choice between these two types of neuropathy would be to do a nerve biopsy study. Such a study was never done.

Dr. Petajan then went on to say that he felt Mrs. Peterson was suffering from atypical GBS caused by the swine flu vaccination. He bases this conclusion on his belief that GBS, BPN and other neuropathies should be lumped together and considered as a single disorder because they all involve demyelinization, a similar slowing of nerve conduction velocity, and recovery in most cases. He believes that the swine flu vaccination triggers an autoimmune response that leads to the destruction of the myelin. So while Dr. Petajan did not find Mrs. Peterson to be suffering from the classic symptoms of GBS such as loss of tendon reflex, he nevertheless felt that she was suffering from atypical GBS caused by the swine flu vaccination.

Other witnesses disagreed with this diagnosis. Dr. Peter Tsairis, a neurologist and professor of neurology at Cornell Medical School, testified that Mrs. Peterson was not suffering from GBS or BPN. Dr. Tsairis has seen some 150 cases of GBS and over 400 cases of BPN.

Dr. Tsairis testified that the authoritative definition of GBS was made by an expert panel of neurologists in 1978. These neurologists included Dr. Barry Arnason, chairman of the Department of Neurology at the University of Chicago School of Medicine. These neurologists published their findings in an article in the Annals of Neurology in July 1978. See defendant's Exhibit No. 206. The expert panel's conclusion—with which Dr. Tsairis agrees—is that motor weakness and areflexia were required for a diagnosis of GBS. Other symptoms strongly supportive of a diagnosis of GBS include acute onset of muscle weakness or paralysis, reaching a peak after four weeks; mild sensory symptoms; an elevation in the cerebrospinal fluid protein; a slowing of nerve conduction velocities; and a slow recovery that may take months.

Finding no conclusive evidence that Mrs. Peterson suffered from areflexia (loss of tendon reflexes), Dr. Tsairis concluded that she was not suffering from GBS. Adding support to his conclusion was the fact that Mrs. Peterson suffered greatly from intense pain which is not characteristic of GBS, and the fact that Mrs. Peterson's disease was chronic rather than acute. Dr. Tsairis testified that the elevated cerebrospinal protein was insignificant. It should be noted that even Dr. Petajan agreed that the elevated cerebrospinal fluid protein level was insignificant.

Dr. Tsairis disagreed with Dr. Petajan's electromyographic evaluation. Dr. Tsairis pointed out a clear mathematical error in Dr. Petajan's computations that raised the conduction velocity for the peroneal nerve from abnormally slow to normal.

Dr. Tsairis also pointed out that the most accurate nerve conduction velocity test is known as the "F-Wave Test." Neither Dr. Petajan nor Dr. Bender used the F-Wave Test on Mrs. Peterson. Dr. Tsairis found that the nerve conduction velocity tests run by Drs. Petajan and Bender were unreliable and that the F-Wave Test was the test that should have been used.

Dr. Tsairis' final conclusion based on the medical records contained in defendant's

Exhibit No. 200 was that Mrs. Peterson was not suffering from any neuropathy.

Although Dr. Tsairis did not personally examine the plaintiff, his conclusions were supported by a number of other physicians who did personally examine Mrs. Peterson.

Dr. Theodore Roberts examined Mrs. Peterson on January 5, 1977. Dr. Roberts has had extensive experience in neurology and is presently a neurosurgeon. His examination of Mrs. Peterson showed normal muscle strength and normal tendon reflexes. He concluded that Mrs. Peterson did not have BPN or GBS due to the lack of any clinical findings consistent with those disorders.

Dr. Leonard Jarcho examined Mrs. Peterson on February 7, 1977. Dr. Jarcho was Chief of Neurology at the University of Utah Medical Center for sixteen years and has published a number of works on neurological problems. His physical examination of Mrs. Peterson indicated that she suffered no muscle weakness or areflexia. Her complaints of fluctuating pain were not consistent with the diagnosis of GBS. In addition, Dr. Jarcho did not agree with Dr. Bender's interpretations of the electromyographic results. Dr. Bender's electromyographic results did show a slowing in the nerve conduction velocity, but only a minimal slowing. Dr. Jarcho testified that the slowing of nerve conduction velocity would have to be much greater if a diagnosis of GBS were to be warranted. Dr. Jarcho essentially saw Dr. Bender's test results as indicating normal nerve conduction velocities for Mrs. Peterson.

Dr. Jarcho's findings are set forth in some detail in defendant's Exhibit No. 255. His conclusion in that document is that Mrs. Peterson was not suffering from BPN, GBS or any malady connected with the swine flu vaccination.

Dr. Robert Burton examined Mrs. Peterson on May 31, 1983. Dr. Burton is a neurologist and the co-author of the book on neurological examinations used by the Mayo Clinic. He gave Mrs. Peterson a physical examination and examined her medical records contained in defendant's Exhibit No. 200. Dr. Burton's physical examination showed no muscle weakness or areflexia. He did an electromyographic study on Mrs. Peterson's left median, ulnar, peroneal, tibial, and sural nerves. That test showed normal conduction velocities for all the nerves tested. His tests included the F-Wave Test which proved normal.

Dr. Burton also testified that Dr. Bender's electromyographic examination of December 30, 1976, showed a result that was too close to normal to warrant a diagnosis of BPN. His final conclusion was that there was insufficient evidence to conclude that Mrs. Peterson had BPN or GBS.

Finally, Dr. John Holbrook examined Mrs. Peterson. Dr. Holbrook is a specialist in internal medicine. He found no muscle weakness or areflexia and concluded that she did not have GBS or BPN.

When the testimony of all the physician witnesses is examined, a number of conflicts emerge. Some of the physicians feel that Mrs. Peterson was suffering from BPN and GBS, but others concluded that she was not suffering from any type of neuropathy. Identical lines of division were drawn over the definition of GBS. Some doctors felt that GBS is a generic term comprising a number of different demyelinating neuropathies. Other doctors took a more rigorous approach to defining GBS.

To resolve these conflicts, the Court must be guided by the burden of proof rules of Idaho. *See* 28 U.S.C. § 1346(b). Under Idaho law, Mrs. Peterson must prove by a preponderance of the evidence that she is afflicted with some malady that was proximately caused by the swine flu vaccination. *See Henderson v. Cominco American, Inc.,* 95 Idaho 690, 518 P.2d 873 (1974); *Dent v. Hardware Mutual Casualty Co.,* 86 Idaho 427, 388 P.2d 89 (1964).

The Court first finds that Mrs. Peterson has not carried her burden of proof with respect to showing that she has GBS. The Court is convinced that the expert panel's criteria for diagnosis of GBS, defendant's Exhibit No. 206, is the definitive statement of the symptoms of GBS. This was the view of Drs. Tsairis, Jarcho, and

Roberts, two neurologists and a neurosurgeon, who have impeccable credentials in neurology. The physicians testifying for Mrs. Peterson were not neurologists except for Dr. Petajan. In balancing Dr. Petajan's testimony that the expert panel's criteria were unduly restrictive with the testimony of the neurologists mentioned above that the panel's criteria are sound, the Court believes that the great weight of the evidence supports a conclusion that the panel's definition of GBS should be accepted as the definition to be used by the Court. A number of other courts have reached a similar conclusion. *See Lima v. United States,* 508 F.Supp. 897 (D.Colo.1981); *Heyman v. United States,* 506 F.Supp. 1145 (S.D.Fla.1981); *Alvarez v. United States,* 495 F.Supp. 1188 (D.Colo.1980).

The expert panel found that the symptom of areflexia was required for a diagnosis of GBS. *See* defendant's Exhibit No. 206. The present record contains no conclusive evidence that Mrs. Peterson suffered from areflexia. There was some evidence that Dr. Terry found that Mrs. Peterson had an "absent bilateral ankle jerk." *See* defendant's Exhibit No. 200 at p. 407. Dr. Terry is an orthopedist. His finding was described as inconsequential by Drs. Tsairis, Burton, and Jarcho, all of whom are neurologists. These doctors found no evidence that Mrs. Peterson was suffering from areflexia consistent with GBS. The Court finds that the overwhelming weight of the evidence is that Mrs. Peterson was not suffering from areflexia.

Following rigorously the expert panel's criteria, the Court must conclude that Mrs. Peterson was not suffering from GBS because the evidence shows she was not suffering from areflexia, a condition required for diagnosis of GBS. *See Cohen v. United States,* 571 F.Supp. 589 (S.D.N.Y.1982). But even if the Court were to hold that the absence of areflexia is not fatal to Mrs. Peterson's GBS claim, other evidence shows that she is not suffering from GBS.

Drs. Tsairis, Jarcho and Burton, all of whom are neurologists, all found that Mrs. Peterson had never displayed the muscle weakness or loss of nerve conduction velocity to a degree consistent with GBS. Although Dr. Bender found a slowing in Mrs. Peterson's nerve conduction velocity, Dr. Jarcho, head of neurology at the University of Utah Medical Center for sixteen years, testified convincingly that the slowing Dr. Bender described was not close to the much greater slowing that would occur in a patient suffering from GBS.

Dr. Petajan also found slowing in the conduction velocities of plaintiff's tibial and peroneal nerves. He also found that the sural nerve conduction speed was just below the normal range. Dr. Tsairis offered unrebutted testimony that Dr. Petajan made a simple·mathematical error in his calculations that, when corrected, raised the conduction velocity of the peroneal nerve into the normal range. Dr. Tsairis also pointed out that a nerve conduction study done on Mrs. Peterson in 1970, six years before she received the vaccination, showed abnormalities in the nerves of her lower extremities. *See* defendant's Exhibit No. 200, p. 122(b).

This testimony, in connection with the testimony of Drs. Jarcho, Burton, Roberts, and Holbrook, show to the Court that the great weight of evidence is that Mrs. Peterson is not suffering from, and has not suffered from, GBS.

Mrs. Peterson also claims to be suffering from BPN and chronic polyneuropathy which she alleges were caused by the vaccination. Again, Drs. Petajan and Bender felt that she might be suffering from BPN, but Drs. Tsairis, Jarcho, Roberts, Burton, and Holbrook all concluded that she was not suffering from BPN. The great weight of the evidence is that Mrs. Peterson did not suffer from BPN or chronic polyneuropathy. Earlier, the Court discussed the inadequacy of the nerve conduction velocity tests done by Drs. Bender and Petajan. Dr. Tsairis, who has seen over 400 cases of BPN and has spent considerable time studying the problem, testified that the tests run by Drs. Bender and Petajan were inherently unreliable. Dr. Tsairis went on to say that he saw no evidence that

the plaintiff was suffering from BPN. This testimony was basically supported by Drs. Jarcho, Roberts, Burton and Holbrook.

■ Even if Mrs. Peterson did suffer from BPN, she did not carry her burden of showing that it was caused by the vaccination. A number of courts have examined this issue and have been faced with plaintiffs who have proffered as much, or more, evidence concerning causation as Mrs. Peterson has in the present case. These cases have all found that the plaintiffs have not carried their burden of proving that BPN is caused by the swine flu vaccination. *See Beller v. United States,* No. 79–777, (W.D. Okl.1982); *Herndon v. United States,* No. 80–195–A (E.D.Va.1981). Dr. Tsairis, the leading expert of those testifying at trial, stated that the cause of BPN is unknown. He testified that a causal relationship between the swine flu vaccine and BPN has never been proved. *Accord,* Fenichel Neurological Complications of Immunization, *Annals of Neurology,* 12:119 (1982) [defendant's Exhibit No. 218].

The Court's conclusion that Mrs. Peterson has no actionable claim for GBS, BPN, or chronic polyneuropathy still leaves her allegations of pain. The Court is convinced that Mrs. Peterson does suffer from pain, but there is no evidence in the record that the swine flu vaccination was the cause of her pain. She complains that her pain began soon after the vaccination, but the testimony at trial was overwhelming that a mere temporal association between vaccination and affliction does not establish anything approaching a causal relationship. *See also, Heyman v. United States,* 506 F.Supp. 1145 (S.D.Fla.1981) (temporal relationship between vaccine and illness was not sufficient to demonstrate causation).

■ In the swine flu case of *Betenson v. United States,* No. 79–0489 (D.Utah 1981), the court was faced with a plaintiff who claimed to have pain caused by the swine flu vaccination. The court found no evidence that the vaccination could cause such pain. Likewise, in the present case, the Court is constrained to find that the plaintiff has not carried her burden of proof to show by a preponderance of the evidence that her pain was proximately caused by the swine flu vaccination.

## CONCLUSION

The Court finds that the plaintiff has not carried her burden of proof of showing that she has any affliction caused by the swine flu vaccination. The Court, therefore, enters judgment for the defendant and against the plaintiff. In accordance therewith, the plaintiff's complaint is dismissed with prejudice.